UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHELLY LAL, et al.,

    Plaintiffs,

    v.

STATE OF CALIFORNIA, et al.,

    Defendants.

_____/

No. C 06-5158 PJH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment came on for hearing on November 23, 2011 before this court. Plaintiffs Shelly Lal ("Mrs. Lal"), individually, and in her representative capacity on behalf of the Estate of Kamal L. Lal, the decedent, and as Guardian Ad Litem on behalf of Sagar Lal, a minor (collectively "plaintiffs"), appeared through their counsel, A. Catherine Lagarde, and Sydney Fairbairn. Defendants California Highway Patrol ("CHP"), and individuals Matthew Otterby ("Otterby") and Frank Newman ("Newman")(all collectively "defendants"), appeared through their counsel, John Devine. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS defendants' motion for summary judgment, for the reasons stated at the hearing, and as follows.

**BACKGROUND**

Plaintiffs filed this action in San Francisco Superior Court, which defendants removed to this court on August 23, 2006. The event giving rise to plaintiffs' claims, a fatal shooting of plaintiff's husband, occurred on March 6, 2005. The court dismissed the action for failure to prosecute on February 2, 2007. Almost one year later, on January 25, 2008, plaintiff moved for relief from the judgment pursuant to Fed. R. Civ. P. 60. The court

denied the motion for relief on March 7, 2008. Plaintiffs appealed the denial of the motion for relief, and the Ninth Circuit reversed and remanded the matter.

Plaintiffs filed a first amended complaint on February 3, 2011. After the court granted in part and denied in part defendants' motion to dismiss in July 2011, plaintiffs filed their second amended complaint on August 9, 2011.

A.  Background Facts

On March 6, 2005 at 1:19 p.m., the South San Francisco Police Department ("SSPD") received a 911 telephone call from Mrs. Lal reporting a domestic disturbance involving her husband, Kamal Lal ("Lal"), at the Lal residence at 801 Hillside Boulevard. See Declaration of Sgt. William Carter ("Carter Decl."), ¶ 3; Declaration of Shelly Lal ISO Opposition ("Lal Decl."), ¶ 3. After Lal interrupted this telephone call, the police called back. After one more disconnection, the police dispatcher finally managed to speak with Mrs. Lal. Carter Decl., ¶¶ 5-7; Lal Decl., ¶ 3-6. As she did so, the dispatcher overheard someone (whom she presumed to be Lal), hitting Mrs. Lal. Carter Decl., ¶ 4. During this conversation, Lal left the scene and drove away in his grey Toyota pickup truck. Lal Decl., ¶ 6. Mrs. Lal gave the dispatcher the license plate number of the pickup truck, as well as Lal's cell phone number. Lal Decl., ¶ 7.

Once Lal took off in his pickup truck, he proceeded to travel from his house to the freeway, where he entered southbound Highway 101. Carter Decl., ¶ 6. The CHP was notified for assistance and a high speed pursuit thereafter ensued. Carter Decl., ¶ 7; CHP Transmission at 3:17, 13:05, 15:45, 22:30. Over the next approximately 45 minutes, Lal traveled southbound on Highway 101, traveled northbound on Highway 101, and exited the freeway to travel over city streets, all at speeds ranging from 50 miles an hour to over 100 miles an hour. See Declaration of Sgt. Newman [1] ("Newman Decl."), ¶¶ 3-5, 7-10; CHP Transmission at 3:17. 13:05, 15:45, 22:30. At one point while on the freeway, Lal appeared

---

[1] Sgt. Newman was an officer at the time of the incident in question as was Lt. Otterby, although both have been promoted, for ease of reference, both are referred to herein as "Officer."

2

to attempt to cause a CHP motorcycle officer directly in pursuit of Lal to crash into the rear of Lal's vehicle. See Declaration of John P. Devine ("Devine Decl."), Ex. A at 27:4-17.

SSPD Sergeant Carter was monitoring radio traffic when Lal initially left the Lal residence, and the SSPD dispatcher told Sgt. Carter that the dispatcher had the suspect's cell phone number. Carter Decl., ¶ 9. Sgt. Carter spoke with Lal after having the dispatcher call Lal's cell phone. Sgt. Carter told Lal to slow down, and that he was going to injure other people. Lal responded that he wanted to "kill" himself. Carter Decl., ¶ 9. Twice more and on a subsequent call, Lal stated that he wanted to "kill" himself or have the police "shoot" him. Carter Decl., ¶ 9. Based on these conversations with Lal, Sgt. Carter had SSPD dispatchers contact San Mateo County Communications and advise them that the suspect wanted to either "kill" himself or have the police "shoot" him. Carter Decl., ¶ 10.

Meanwhile, CHP Officer Frank Newman, who was positioned in his patrol vehicle facing southbound Highway 101 in South San Francisco, saw the pursuit heading towards his position, and he entered traffic and became the lead police vehicle in pursuit on southbound Highway 101. Newman Decl., ¶¶ 7-8. During the pursuit, Newman heard information from dispatch stating that the suspect had said that he wanted officers to shoot him. Newman Decl., ¶¶ 9-10. The dispatchers also ascertained that Lal did not have any record of gun ownership, and that Lal had no outstanding warrants. See CHP Transmission Tr. at 13:07, 9:50.

Eventually, pursued by CHP cars, Lal took the Hillsdale Boulevard exit off Highway 101, and drove onto a collector road that parallels the freeway. CHP officers deployed a spike strip on the collector road, and when Lal drove over it, he partially disabled his vehicle. See Declaration of Lt. Matt Otterby ("Otterby Decl."), ¶¶ 5-6; CHP Transmission Tr. at 41:57. Lal nonetheless managed to reenter Highway 101 and reach the Ralston Ave. off ramp, where he lost control of his truck and veered off the ramp. Otterby Decl., ¶¶ 5-6; CHP Transmission Tr. at 42:02. His pickup truck came to a stop in a ditch alongside the freeway. Otterby Decl., ¶¶ 5-6; CHP Transmission Tr. at 42:19. Lal opened the driver side

3

door and got out.

When Lal got out of his vehicle, numerous officers on the scene were yelling commands at Lal, and Newman addressed Lal through his patrol car loudspeaker, telling Lal to put his hands in the air. Otterby Decl., ¶ 12. Lal briefly complied with the officers' directions by putting his hands in the air, but then he put them down again, and stuck his hands in his pockets. He responded to Newman by saying, "just shoot me, just shoot me." Newman Decl., ¶¶ 17-18.

Lal then reached down to the ground and picked up a big rock. He smashed himself in the forehead with the rock. Navarra Decl., ¶ 7. He hit himself on the head with the rock three or four times, until he started to bleed a good amount. Newman Decl., ¶¶ 20-22. Lal then attempted to pull out of the ground a four foot long metal pole, upon which he attempted to impale himself. Newman Decl., ¶¶ 23-24. Lal did not succeed.

Lal next walked toward CHP officers Newman and Otterby, carrying a rock in his hand. When officers told him to drop it, he pretended that his cell phone (which was also in his hand) was a pistol and pantomimed pointing it at the officers. Lal then picked up other rocks, and began throwing several soft-ball sized rocks at Newman and Otterby. Newman Decl., ¶ 26; Navarra Decl., ¶ 10. One of the rocks hit the spotlight on the right side of Newman's patrol car, right next to where Newman and Otterby were standing. Id. The rock shattered the spotlight on the patrol car. Id.

Lal then began walking toward the CHP patrol cars while continuing to throw rocks. He began to approach Otterby and Newman, who were standing shoulder to shoulder. Otterby Decl., ¶¶ 8-11, 23, 27, Exs. A-D; Newman Decl., ¶¶ 28-29. Lal held a large rock about the size of a football as he approached, and failed to drop the rock when ordered by Otterby to do so. Newman Decl., ¶ 30; Otterby Decl., ¶ 28. Lal kept advancing at an irregular pace, forcing Newman and Otterby to retreat by backing up. Otterby told Lal, "we are going to have to shoot you if you don't drop that rock." Otterby Decl., ¶ 29.

Otterby and Newman shot Lal simultaneously, when Lal refused to stop advancing

4

on the officers, and had advanced to within a few feet of the officers. Otterby Decl., ¶ 31; Newman Decl., ¶ 40.

B.   The Instant Action

The second amended complaint ("SAC") alleges that defendants Newman and Otterby used unreasonable, unnecessary, and excessive force during the enforcement stop of Lal. As a result, plaintiffs allege that they suffered injury. Specifically, plaintiffs allege the following four claims for relief:

    (1)   Excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 against Newman and Otterby;

    (2)   Negligence against Newman, Otterby, and the CHP;

    (3)   Wrongful Death against Newman, Otterby, and the CHP; and

    (4)   Assault and Battery against Newman, Otterby, and the CHP

See SAC, ¶¶ 15-35.

Defendants now move for summary judgment.

## DISCUSSION

A.   Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885,

888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

In section 1983 cases such as the one here, the qualified immunity issue is particularly well-suited for disposition on summary judgment. See, e.g., Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004).

B. Defendants' Motion

Defendants seek summary judgment with respect to all claims asserted against them: (1) the section 1983 claim against Newman and Otterby; (2) plaintiffs' negligence claim against all defendants; (3) plaintiffs' wrongful death claim against all defendants; and (4) plaintiffs' battery claim against all defendants.

1. Plaintiffs' Section 1983 Claim Against Newman and Otterby

Defendants seek summary judgment with respect to plaintiffs' section 1983 claim on that they are entitled to qualified immunity. Generally, a court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Pearson v. Callahan, 129 S. Ct. 808, 815, 818 (2009)(overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier)("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

6

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequential process for resolving claims of qualified immunity. First, a court must consider the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201 ("In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established."). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. However, Pearson revised this standard somewhat, and held that the court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. Pearson, 129 S. Ct. at 815 (noting that while the Saucier sequence is often appropriate and beneficial, it is no longer mandatory).

Plaintiffs assert that defendants Newman and Otterby's use of force against Lal resulted in a violation of Lal's constitutional rights, specifically, violation of Lal's fourth amendment right to be free from excessive use of force. Thus, the relevant questions for purposes of qualified immunity are whether defendants violated Lal's constitutional rights by shooting him, and if there was a constitutional violation, whether defendants' actions violated a clearly established right.

As to the former, the court concludes that no constitutional violation has been shown. Both parties agree on the applicable legal standard: in order to determine whether a specific use of force was reasonable under the Fourth Amendment, the court must balance the nature and quality of the intrusion on the individual's fourth amendment interests against the countervailing government interests at stake. Graham v. Connor, 490 U.S. 386, 396 (1989). Relevant factors to the inquiry include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

See id.; see also Billington v. Smith, 292 F.3d 1177, 1184 (9th Cir. 2002). Generally speaking, however, a police officer may reasonably use deadly force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Billington, 292 F.3d at 1184.

Here, taking the totality of circumstances into account, and viewing the undisputed evidence in the light most favorable to plaintiffs, the court finds that the officers acted reasonably. The evidence demonstrates: the officers were aware that officers were originally called to Lal's home for a domestic violence report by Lal's wife about him; Lal led police officers on a long and high speed chase over city streets as well as the freeway, during which Lal drove recklessly and in apparent disregard of others' safety; Lal indicated he wanted to kill himself or have the officers shoot him; when Lal got out of his car near the ditch at the off ramp, he did not comply with the officers' instructions to put his hands up; Lal hit his own head with a rock until he bled and attempted to impale himself on a metal pole; Lal mimed using his cell phone as a gun that he pointed at the officers, which initially prompted Otterby, who recognized the phone was not a gun, to instruct all officers on the scene not to shoot; Lal picked up rocks and threw them at the officers' car, breaking the light on the car; Lal came towards the officers with a football sized rock over his head, and ignored the officers' instructions to put the rock down; Lal advanced with this rock to within a few feet of the officers; and both officers simultaneously shot Lal. See generally Otterby Decl.; Newman Decl. Based on these facts, the court concludes that defendants had probable cause to believe that they faced a threat of serious physical harm from Lal. As such, their conduct in using deadly force was objectively reasonable.

In an effort to create a material dispute of fact as to the reasonableness of the defendants' conduct in shooting Lal, plaintiffs point to the fact that Lal had no gun or weapon, that Mrs. Lal suffered no actual injuries as a result of the alleged domestic violence inflicted on her by Lal, and that the officers knew that Lal had no outstanding warrants.

8

While the absence of injury to Mrs. Lal (if known by Newman and Otterby), the absence of a traditional weapon such as a firearm rather than a large rock, and the absence of any outstanding warrants for Lal, add to the mix of information available to the officers to inform their decision to use deadly force, these absences do not in any way negate or outweigh the undisputed facts set forth above. That Lal had no outstanding warrants has no bearing on the defendants' determination whether Lal was dangerous. There is no evidence, expert or otherwise, that all people who present a potential threat to the police have outstanding warrants or that the absence of outstanding warrants should suggest to the police that a suspect is not dangerous no matter his conduct leading up to the point of apprehension.

With regard to the presence of a weapon, while it does not appear that the officers believed Lal had a firearm, they had already witnessed Lal using rocks to injure himself and to destroy police property. Clearly the large football sized rock he was carrying towards the defendants raised above his head was capable of being used to inflict serious injury on them, and their belief to that effect was reasonable.

With regard to the absence or presence of injury to Mrs. Lal at the hands of her husband, first there is no evidence that Newman or Otterby actually knew whether Mrs. Lal had or had not been injured by Lal. Second, it is not entirely clear what plaintiffs' counsel intended to suggest by arguing at the hearing that Lal's violence towards his wife would have only been charged as a misdemeanor and a not a felony but for the fact that the victim was his wife. This trivialization of Lal's conduct seems to be based on the premise that the defendants shot Lal because he hit his wife, but because he did not actually injure his wife, he should not have been shot. However, defendants' claim for qualified immunity is based on their having shot Lal because they feared for their own safety, and there is no evidence that would suggest a vengeful motive or that the defendants' concern for their own safety was based on what they believed Lal had done to his wife rather than on his conduct at the scene. Plaintiffs' counsel also suggested that Lal's failure to cause any

9

injury to bystanders while leading the police on a 45-minute long high speed pursuit, reflected his desire to *protect* bystanders. The court finds these arguments to be just that, attorney argument, and as such is insufficient to raise a triable issue of material fact as to the reasonableness of defendants' conduct.

Alternatively, plaintiffs suggest that the officers' conduct was unreasonable both because they had a duty to use less intrusive means in order to apprehend Lal and failed to do so; and because they had a duty to prevent the situation from escalating into one that required the officers to shoot Lal.

Plaintiffs, however, have failed to submit any controlling authority that would clearly require the officers in the present situation to employ less intrusive means against Lal. Indeed, the court's review of the cases cited by both sides reveals that the contrary is true: police officers "need not avail themselves of the least intrusive means of responding" where exigent circumstances are present, and need only act "within that range of conduct [the court] identif[ies] as reasonable." See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994)("the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them. Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment") (citations omitted). Here, in view of the totality of the circumstances leading to the standoff with Lal; the fact that Otterby initially told the other officers on the scene *not* to shoot; that the officers only shot Lal when he continued advancing towards them with a football sized rock held over his head and in defiance of repeated orders to put the rock down; and that the officers both shot Lal simultaneously as Lal made his final approach, the defendant officers acted within the acceptable range of reasonable conduct, and need not have availed themselves of any lesser intrusive alternative.

Moreover, although the law did not require the officers to use a lesser intrusive means of responding to Lal, the evidence reveals that the officers nonetheless *did* consider such means. Newman, for example, declared that the CHP did not equip officers with

10

Tasers or other less lethal types of guns at the time of the underlying incident, also that at the scene he requested assistance from any agencies that could respond to the escalating situation with "less than lethal" weapons, and was told that a K-9 unit was en route. Newman Decl., ¶¶ 24-25. Similarly, Otterby declared that when he learned at the scene that the Sheriff's Office had a K-9 unit available, he walked toward the Sheriff's patrol car on the scene and asked a Sheriff's deputy if he had a dog with him, and was told that a K-9 unit was on the way. Otterby Decl., ¶¶ 16-17. Otterby then instructed Newman to continue giving orders to Lal until the police dog arrived. Id., ¶ 18. Ultimately, these facts – which plaintiffs do not materially dispute – merely confirm the reasonableness of the officers' conduct, as they demonstrate that the officers did consider the means available to them other than deadly force prior to the point at which they deemed such force necessary to subdue Lal.

As for plaintiffs' contention that the defendants had a duty to prevent the situation from escalating into one that required the officers to shoot Lal, in view of the fact that Lal was "an emotionally disturbed person with no sense of self presentation left," plaintiffs present no authority imposing a legal duty on law enforcement to predict or prevent situations that would subject emotionally disturbed persons in particular to deadly force. The officers were required to act reasonably under the circumstances. That the circumstances included Lal's obvious emotionally disturbed state, did not require that the officer first attempt to overtake Lal by their physical strength and numbers as plaintiffs argue. Indeed, plaintiffs seem to suggest that Lal's mental state made him less of a threat than someone who was not emotionally disturbed. Plaintiffs have not cited and the court is unaware of any authority commanding that emotionally disturbed suspects be treated differently because they are less dangerous.

Finally, and to the extent plaintiffs rely on the testimony of two experts, Roger Clark and Ernest Burwell, for "proof" that defendant officers acted unreasonably in using deadly force against Lal, plaintiffs' reliance on these experts is misplaced. The Ninth Circuit

precludes reliance on expert reports on the question of reasonableness in order to avoid summary judgment. See Billington, 292 F.3d at 1189 ("the fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable.")(plaintiff cannot "avoid[] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless"). So here. The Clark and Burwell testimony relied on by plaintiffs does nothing more than second guess the officers' conduct with the benefit of hindsight – an act of supposition that is expressly disallowed.[2] See Graham, 490 U.S. at 396 ("[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). Accordingly, neither of plaintiffs' expert declarations is successfully probative on the issue of reasonableness.

In sum, therefore, the court accordingly finds that the officers' conduct was reasonable, and that there was no constitutional violation stemming from the officers' use of deadly force against Lal. This was certainly an unfortunate tragedy, but it was one that Lal set in motion not the responding law enforcement officers.

Even if the there was a constitutional violation, however, plaintiffs would still fail to materially dispute the second element of the qualified immunity inquiry – i.e., whether it would be clear to a reasonable officer that the above conduct was unlawful under the facts of the case. See, e.g., Pearson, 129 S. Ct. at 822 (relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted). In view of

---

[2] Furthermore, as defendants note, in his declaration, Roger Clark purports to testify as to what actually occurred during the incident in question – and thus lacks personal knowledge, since Mr. Clark was not present. For example, Mr. Clark states that Lal "feigned" throwing a rock at the officers and thus presented no direct threat to the officers. However, this characterization of the record is contrary to the direct testimony of defendants in this case, who were present at the scene, and observed Lal both actually throwing rocks at defendants just prior to advancing on them, and furthermore breaking the spotlight on a police car with a thrown rock. Otterby Decl., ¶¶ 22-23, 26; Newman Decl., ¶ 26.

the undisputed facts recited above, there is no evidence or suggestion that the officers were on notice that their conduct under the circumstances was in any way clearly unlawful. Moreover, as the court stated in Graham, an excessive force case, "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397. And fundamentally, as the Saucier Court pointed out, the "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." See 533 U.S. at 205. So even if the officers make a mistake, as long as that mistake is reasonable, the officer will still be entitled to immunity. Id; Graham, 490 U.S. at 396. Given the facts here, the court concludes that even if the defendants were mistaken as to the need for deadly force, that mistake was reasonable.

In sum, under both or either of the Saucier prongs, the officers' conduct in using deadly force against Lal was objectively reasonable, and summary judgment on grounds of qualified immunity is accordingly GRANTED in defendants' favor as to the section 1983 claim.

2. Negligence Claim (all Defendants)

Defendants also seek summary judgment with respect to plaintiffs' negligence claim. Plaintiffs' negligence claim appears to be premised on two theories: that defendants were negligent in their shooting of Lal, and also, that defendants were negligent in their pre-shooting conduct with respect to Lal, by inappropriately escalating the situation that led up to the shooting.

With respect to plaintiffs' claim that defendants acted negligently in using deadly force upon Lal, the court's finding of reasonableness with respect to the section 1983 claim precludes a finding of negligence based on the same conduct.

With respect to plaintiffs' claim that defendants were negligent in connection with their pre-shooting conduct – i.e., that based in Lal's emotional state, defendants should

have known to refrain from allowing themselves to be "trapped" between the police car and the ditch, thereby presenting an "easy target" to Lal in his effort to trigger a shooting incident – this argument fails as a matter of law. The case law actually supports the opposite conclusion – that officers are *not* charged with any such related legal duties. See, e.g., Adams v. City of Fremont, 68 Cal. App. 4th 243, 276 (1998)(law enforcement officers are shielded from ordinary negligence claims based on their response to public safety emergencies when those efforts prove to be ineffective in preventing self-inflicted harm or harm caused by third parties); Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1097 (2004)("the conduct of the police – [the officer's] decisions as to how to deploy his officers at the scene, the efforts made in an attempt to defuse the situation as safely as possible, and other such factors – cannot subject appellants to [tort] liability").

Finally, and to the extent plaintiffs also argue that the CHP entity is liable for negligent failure to train, plaintiffs admit that such liability must be premised on the deprivation of a constitutional right, which cannot be demonstrated for the reasons already stated.

For all these reasons, defendants' motion for summary judgment with respect to plaintiffs' negligence claim is also GRANTED.

3. <u>Wrongful Death Claim (all Defendants)</u>

Defendants also contend that an affirmative finding as to the reasonableness of the officers' conduct in using deadly force against Lal precludes any liability for any of the defendants with respect to the wrongful death claim.

Defendants are ultimately correct. There can be no civil liability under California law as the result of a justifiable homicide. See Reynolds v. County of San Diego, 858 F. Supp. 1064, 1074-75 (S.D. Cal. 1994); Gilmore v. Superior Court, 230 Cal. App. 3d 416, 420-423 (1991). Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was "necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal

14

duty" or when "necessarily committed in retaking felons who have been rescued or who have escaped ... and who are fleeing from justice or resisting such arrest." The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances "reasonably create[d] a fear of death or serious bodily harm to the officer or to another." See Kortum v. Alkire, 69 Cal. App. 3d 325, 333 (1977); Reynolds, supra, 858 F. Supp. at 1074-1075; People v. Rivera, 8 Cal. App. 4th 1000, 1007 (1992)(using Fourth Amendment "reasonableness" analysis to determine existence of probable cause for arrest, held that use of attack dog by police officer was justified because the officer "reasonably feared for his safety, and that of others in the area"). The same is true of Government Code § 820.2, which provides immunity from liability to public employees for their discretionary acts. See Reynolds, 858 F. Supp. at 1074-1075.

The same reasons that support the court's conclusion that Newman and Otterby acted reasonably in shooting Lal, also support a finding that the shooting was justified under Penal Code § 196, and plaintiffs' state law wrongful death claim fails as to them. Because the officers are not liable, there is no basis for liability against defendant CHP, either.

Defendants' motion for summary judgment as to this claim is therefore GRANTED.

4. Assault/Battery Claim (all Defendants)

Finally, defendants also seek summary judgment with respect to plaintiffs' assault and battery claim against them. As with the wrongful death claim, plaintiffs' assault and battery claim against defendants is dependent on proof that defendants applied an unreasonable amount of force. Since defendant officers' actions cannot be viewed as unreasonable, see qualified immunity discussion above, the state law assault and battery claim must also fail. See, e.g., Johnson v. County of Los Angeles, 340 F.3d 787, 794 (9th Cir. 2003). So, too, does the claim for liability against the CHP.

Accordingly, summary judgment on plaintiffs' assault and battery claim against defendants is GRANTED.

C. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

**IT IS SO ORDERED**.

Dated: January 9, 2012

                PHYLLIS J. HAMILTON
                United States District Judge